UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
NOEL HICKS,

                            Petitioner,

      -against-

JOSEPH F. BELLNIER, Superintendent of the
Upstate Correctional Facility,

                            Respondent.
-------------------------------------------------------------X

<u>DECISION AND ORDER</u>
11-cv-5803 (WFK)

**WILLIAM F. KUNTZ, II, United States District Judge:**

Before the Court is Petitioner Noel Hicks's Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For his role in three burglaries, Petitioner was convicted in New York state court of three counts of burglary in the second degree, one count of criminal possession of stolen property in the fourth degree, one count of criminal possession of stolen property in the fifth degree, one count of petit larceny, and one count of criminal mischief in the fourth degree. On charges related to a fourth break-in, the jury found Petitioner not guilty of burglary in the second degree and criminal possession of stolen property in the third degree, but convicted him of criminal possession of stolen property in the fourth degree, a lesser included offense.

Petitioner now alleges four constitutional errors by the state court that he contends warrant a writ of habeas corpus. Petitioner argues that: (1) the trial court erred in refusing to sever the indictment; (2) the trial court erred in denying Petitioner's motion to suppress evidence; (3) the trial court erred in continuing with jury selection after one potential juror was dismissed for inappropriate comments; and (4) the trial court erred in denying an adjournment after granting Petitioner's motion for self-representation. Because Petitioner's claims are exhausted and neither procedurally defaulted nor time-barred, they are ripe for adjudication by a federal habeas court. However, the state court's rulings on Grounds 1, 3, 4, and part of Ground 2 of the Petition were neither contrary to nor involved unreasonable application of clearly established federal law as determined by the United States Supreme Court. Furthermore, the Fourth Amendment issues raised in Ground 2 are barred by the rule in *Stone v. Powell*, 428 U.S. 465, 483 (1976). Accordingly, the Petition is denied in its entirety.

# FACTUAL BACKGROUND

I.    THE BURGLARIES AND ARREST

Petitioner Noel Hicks is a convicted burglar, albeit, not a very good one. Beginning in November 2007, Petitioner embarked on a spree of home burglaries in Nassau County, New York. Petitioner was involved in four known break-ins where he stole jewelry, electronics, and other valuables. During two of Petitioner's burglaries, he left personal items containing his DNA at his victims' homes. In another instance, Petitioner provided a photocopy of his license to a jeweler to whom he was selling illegally obtained valuables. Petitioner was eventually arrested, four to five blocks from the scene of his last break-in, after being identified by a vigilant neighbor who watched Petitioner climb through a window. As will become clear below, Petitioner left a substantial trail of incriminating evidence as he engaged in his criminal pursuits.

## A. The Flint Ave. Burglary

On November 19, 2007, Petitioner broke into the home of a retired New York Police Department ("NYPD") employee, Kenneth Jones, on Flint Ave. in Hempstead, New York (hereinafter the "Flint Ave. Burglary"). Jones had a surveillance camera installed in his home that captured an intruder, later identified as Petitioner, rummaging throughout the house. The camera also captured Petitioner taking Jones's coat, but leaving his own jacket behind. The jacket left behind contained a lighter and eyeglasses that did not belong to Jones. It was later determined that the DNA collected from those items matched Petitioner's DNA. Petitioner was ultimately found guilty of burglary in the second degree, amongst other crimes, for this conduct.

## B. The Marvin Ave. Burglary

On January 18, 2008, an intruder broke into Christiana Alicea's home on Marvin Ave. and stole approximately 25 to 30 pieces of her jewelry (hereinafter the "Marvin Ave.

Burglary").[1]  Soon thereafter, Alicea discovered that her jewelry had been sold to a local jeweler, Gold Town Jewelry, on Main St. in Hempstead.  The store's proprietor, Dong Yul Song, told police that when he bought the jewelry, he took a photocopy of the seller's driver's license and recorded each piece of jewelry purchased in a ledger.  At trial, Song identified Petitioner as the seller.  Petitioner was ultimately acquitted of burglary in the second degree and possession of stolen property in the third degree charges related to this incident, but he was convicted of stolen property in the fourth degree.

### C.  The Clyde Ave. Burglary

On January 30, 2008, Petitioner broke into the home of Johnathan Wilds on Clyde Ave. (hereinafter the "Clyde Ave. Burglary").  The Wilds returned home later that day to discover that their window had been smashed open with a brick and that they were missing jewelry, a laptop computer, a Playstation system, a DVD collection, and police equipment bags.  Under the window that the burglar had entered through, the police found a watch and a lighter that did not belong to the Wilds.  At trial, it was established that the lighter contained DNA that matched Petitioner's DNA, while the watch contained insufficient DNA to provide a match.  Petitioner was subsequently found guilty of burglary in the second degree, among other crimes, for this conduct.

### D.  The Forest Ave. Burglary and Petitioner's Arrest

On January 31, 2008, the day after the Clyde Ave. Burglary, Petitioner broke into the home of Minnie Palmer on Forest Ave. (hereinafter the "Forest Ave. Burglary") and stole jewelry belonging to her daughter.  However, during the course of the break-in, the Palmers' neighbor, Michael Deluca, was throwing out his garbage when he heard glass shatter next door.

---

[1] In referring to this incident as "the Marvin Ave. Burglary," the Court does not imply that Petitioner was the burglar at Alicea's home.  The jury found Petitioner not guilty of second degree burglary with regard to this incident and the Court does not disturb the jury's finding.  Instead, the name is used to clearly distinguish between and identify the four incidents.

Deluca looked toward the Palmers' house and saw a foot going through the back window. Approximately one minute later, the Palmers' house alarm sounded. Deluca then witnessed an African-American male with a gray beard wearing a brown leather jacket, dark pants, and a gray cap or hood exit out the back doors.

Deluca promptly called 911. Deluca informed officers that the intruder fled north away from the Forest Ave. home. A police bulletin went out providing the description given by Deluca and the direction that the perpetrator had fled. Police Officer Anthony D'Alto heard the bulletin and was directed to investigate. As D'Alto drove towards the crime scene, he canvassed the area around Forest Ave. and quickly located Petitioner—matching the eye-witness's physical description and heading north away from the crime scene on foot. D'Alto then stopped Petitioner for questioning.

Simultaneously, Police Officer Eric Myer also responded to the radio call and met with Deluca on Forest Ave. While listening to Deluca recount what he has witnessed, Myer was informed that D'Alto had stopped a potential matching suspect. Deluca agreed to go and view the stopped individual.

Deluca and Myer arrived at the scene of the stop moments later. Petitioner was standing thirty to forty feet from the radio motor patrol ("RMP") with only D'Alto immediately near him. Petitioner was not handcuffed, not under arrest, and, while three other officers were in the vicinity, they were not surrounding Petitioner. Deluca instantly identified Petitioner as the individual that he saw break into Palmer's home. From Deluca's 911 call to the subsequent identification, approximately ten minutes elapsed.

At this point, Petitioner was put under arrest and patted down by the arresting officers. The officers discovered a bag of jewelry, belonging to Ms. Palmer, in Petitioner's pocket. In a processing search conducted at the police station, officers recovered a second bag of jewelry.

### E. *Indictment and the Motion to Sever*

For these acts, the Nassau County District Attorney's Office (hereinafter the "DA") obtained an indictment charging Petitioner with four counts of burglary in the second degree (New York Penal Law ("P.L.") § 140.25(2)), criminal possession of stolen property in the third degree (P. L § 165.50), criminal possession of stolen property in the fourth degree (P. L. § 165.45(1)), criminal possession of stolen property in the fifth degree (P.L. § 165.40), petit larceny (P.L. § 155.25), and criminal mischief in the fourth degree (P.L. § 145.00(1)).

On March 20, 2009, Petitioner's counsel moved to sever the indictment to have each incident tried separately. That motion was denied by the Supreme Court, Nassau County (Grella, J.) and the original indictment stood. *See* Dkt. 8-1 (Ex. 1, Brief for Defendant-Appellant in *People v. Hicks*, 2009-6011 (2d Dep't 2010) ("App. Br.")), at 21–22, n. 2.

II.    PRE-TRIAL MOTIONS AND JURY SELECTION

### A. *The Motion to Suppress*

Prior to trial, Petitioner sought a "combined *Wade/Mapp/Dunaway* hearing"[2] to challenge the lawfulness of his stop as well as the admissibility of Deluca's "show-up" identification and the jewelry recovered from Petitioner's person during his arrest. At the evidentiary hearing, the DA presented a case tracking the narrative recounted above, *see supra* Sec. I.D. Petitioner presented no witnesses at the hearing.

The trial court denied the motion to suppress. The court held that (a) the officers had reasonable suspicion to stop Petitioner; (b) the show-up identification was not unduly or unreasonably suggestive; and (c) the jewelry was lawfully seized following a lawful arrest.

---

[2] *United States v. Wade*, 388 U.S. 218 (1967); *Mapp v. Ohio*, 367 U.S. 643 (1961); *Dunaway v. New York*, 442 U.S. 200 (1979).

### B. Potential Juror Number 10

On the afternoon of the second day of jury selection, in the midst of the voir dire and after six jurors had already been selected, defense counsel informed the court that he had seen Potential Juror Number 10 ("PJ10") speaking loudly with a court security officer ("CSO"), and appearing distraught and irate. Counsel requested that the court question the witness, particularly to ensure that no other potential jurors had overheard. The Clerk of the Court then informed the court that PJ10 had complained to the CSO that Petitioner had been looking her up and down. PJ10 then testified that she believed that Petitioner was looking at her and she thought that Petitioner may have been looking at her ring and "sizing [her] up." Dkt. 14–16 (Trial Transcript ("T.")) at 298. PJ10 indicated that she knew what Petitioner was on trial for and that she could not give him a fair trial because she thought that he was guilty.

The Court inquired whether PJ10 had discussed her concerns with any other potential jurors. PJ10 stated that she had not discussed it with any other potential jurors. (T. 298). Defense counsel had an opportunity to ask questions, which he briefly did. Counsel then stated: "I was certainly looking at all the jurors when they left and I didn't get any indication that anything was wrong. You know, I don't think this needs to turn into an inquest. I think we can continue. I think the sanctity of the jury process is safe and we're prepared to proceed." (T. 300). PJ10 was released from service on consent of the parties.

The trial judge then brought back in the potential jurors and gave the following instruction:

> THE COURT: [B]efore we go any further, ladies and gentlemen, I want to mention something, that someone during the luncheon recess brought a matter to the attention of the Court and I want that person to know that it was dealt with appropriately. And for everybody else, I'm directing that you not speculate on who or what that might have involved, but I can assure the person that brought the

matter to my attention that I appreciate it was brought to my attention, it was dealt with promptly.

(T. 302). Defense counsel requested no further instruction.

### C.  Petitioner's Motions for Self-Representation and an Adjournment

Following the selection of a jury to the satisfaction of both parties' counsel, the Court entertained a motion from Petitioner to invoke his right to self-representation. The Court informed Petitioner that opening statements and witness testimony would begin that day even if Petitioner were to take over as counsel. (T. 363–64, 379). Petitioner nonetheless persisted with his motion. The Court then granted Petitioner's motion to invoke his right to self-representation. Petitioner's former attorney continued on as stand-by counsel and legal advisor for the entirety of the trial.

Once Petitioner was representing himself, he immediately requested an adjournment, ranging from one week to one month, so that he could review his case file, including the *Rosario* material,[3] and "study the law." (T. 377–78). The court denied Petitioner's request for an adjournment for three primary reasons. *First*, the motion was made after the court had gone through 150 potential jurors and empaneled a jury to the parties' mutual agreement. *Second*, the court told Petitioner that the District Attorney had provided Petitioner and his former/stand-by counsel with "all of the appropriate documentation in a timely fashion." (T. 378). The court stated on the record that Petitioner had received all of the *Rosario* material that he was entitled to have and had "an opportunity to discuss it with [his former] attorney, to review it or to have [his former]

---

[3] "*Rosario* material" refers to various materials that the New York state prosecutors must turn over to the criminal defendant "to provide potential impeachment materials to the defense to guard against inconsistent or inaccurate testimony." Michael Lumer, *People v. Jackson: Rosario Reductionism and Collateral Attacks*, 60 BROOK. L. REV. 1229, 1230 n.3 (1994); *see also People v. Rosario*, 9 N.Y.2d 286, *cert. denied*, 368 U.S. 866 (1961); *as codified* N.Y. Crim. P. L. § 240.20 ("Discovery; upon demand of defendant") (listing proper discovery requests by criminal defendants). Pursuant to New York Criminal Procedure Law (N.Y. Crim. P. L.) § 240.45(1), during a jury trial, *Rosario* material must be produced by the prosecutor prior to its opening statement.

attorney review it." (*Id.*)  *Third*, the trial court found that the request was a dilatory tactic. *See People v. Hicks*, 78 A.D.3d 1075, 1076 (2d Dept. 2010).  Furthermore, the court admonished Petitioner because he had previously indicated to the court that he was aware that if he invoked his right to self-representation, opening statements and witness testimony would nonetheless begin that day. The trial then commenced.[4]

III.  THE TRIAL AND CONVICTION

At trial, the DA presented testimony regarding each of the four burglaries as described in Section I, *supra*.  Regarding the Forest Ave. Burglary, the DA presented Deluca's testimony recounting the break-in and his subsequent identification of Petitioner.  Officer D'Alto also testified about when and where he first encountered Petitioner—matching the description from the radio call—and the subsequent stop, identification, arrest, and search.

For the Marvin Ave. Burglary, the DA introduced the testimony of the victim, Alicea, and the jeweler, Song.  Song identified Petitioner as the man who had sold the store twenty-nine pieces of jewelry, as recorded in the store's ledger, and had presented Song with his ID at the time of the sale.  Detective Robert Abriola also testified regarding his investigation and confirmed that Alicea's missing jewelry was in fact the jewelry Petitioner sold to Song's jewelry store.

Concerning the Flint Ave. Burglary, the DA presented the evidence from Jones (the victim and a retired NYPD employee) who recorded the break-in with home surveillance video. The jury heard evidence that while Petitioner stole Jones's coat and some watches, he left his own jacket, containing his lighter and eyeglasses, in the house.  The jury also heard the testimony of qualified expert witness Kerstin Rosmarion-Tabert, a forensic geneticist with the

---

[4] It is worth noting, that while trial started that day, with four witnesses testifying, Petitioner then had the entire weekend as well as Monday and Tuesday evenings to work on his case after being denied an adjournment.  Additionally, at no time did Petitioner inform the Court that he was unprepared for the examination of any particular witness.

Nassau County Medical Examiner's Office. Tabert testified that she took DNA from the jacket, lighter, and eyeglasses and found DNA on each item that matched Petitioner's DNA.

Lastly, the jury heard testimony about the Clint Ave. Burglary. Wilds, the victim and an NYPD officer, testified about returning to a ransacked house, with a broken window, and a number of missing personal belongings. The jury heard from Wilds and Detective Bruce Schurmann that below the broken window, where Petitioner entered the house, a lighter and a watch were discovered. Tabert testified concerning the DNA analysis that she conducted on these items and informed the jury that there was a match between Petitioner's DNA and the DNA on the lighter, but that there was insufficient material on the watch to conduct the analysis.

Petitioner presented no witnesses at trial.

The jury returned a verdict finding Petitioner guilty of three counts of burglary in the second degree, one count of criminal possession of stolen property in the fourth degree, one count of criminal possession of stolen property in the fifth degree, one count of petit larceny, and one count of criminal mischief in the fourth degree, for the crimes committed at Forest Ave, Flint Ave., and Clyde Ave. Regarding the alleged Marvin Ave. Burglary, the jury acquitted Petitioner of one count of burglary in the second degree and one count of criminal possession of stolen property in the third degree. However, Petitioner was convicted of criminal possession of stolen property in the fourth degree, which had been submitted as a lesser included offense. On June 15, 2009, the trial court sentenced Petitioner, as a persistent violent felony offender, to twenty-five years to life imprisonment for his burglary convictions. For his additional convictions, Petitioner was sentenced to one year of imprisonment. All sentences were ordered to run concurrently.

IV. DIRECT APPEAL

Petitioner brought an appeal in the New York State Supreme Court, Appellate Division, Second Department (the "Second Department"). Petitioner was represented by counsel on

appeal. Petitioner's direct appeal raised the same four issues that he now raises in his federal habeas petition. In brief, Petitioner contended that: (1) it was error to try the four alleged burglaries together, and the Clyde Ave. Burglary should have been dismissed as a matter of law; (2) the evidence recovered by the police, the out-of-court statements, and the show-up identification should have been suppressed; (3) Petitioner was denied a fair trial and due process when the court did not excuse the entire panel of jurors after the incident with PJ10; and (4) Petitioner was denied a fair trial when the court refused his request for an adjournment. The DA argued that all of Petitioner's claims were without merit and that the effective assistance of counsel/right to self-representation claim was unpreserved at trial.

On November 23, 2010, the Second Department issued a decision denying all of Petitioner's direct appeal claims. *See Hicks*, 78 A.D.3d at 1075. The Second Department held that while "showup procedures are generally disfavored, they are permissible where, as in this case, they are employed in close spatial and temporal proximity to the commission of the crime for the purpose of securing a prompt and reliable identification." *Id.* The appellate court also held that the record supported the trial court's finding that there was reasonable suspicion to stop and detain Petitioner based upon the matching description, and the close geographic and temporal relationship between the stop and the crime. *Id.* at 1075–76. The Second Department found that there was no improvident exercise of discretion by the trial court in denying Petitioner's motion for an adjournment. *Id.* at 1076. The appellate court agreed that the *Rosario* material was timely disclosed, that Petitioner had ample time to review it, and that his motion was a dilatory tactic. *Id.* The Second Department found the remaining claims without merit. *Id.*

On December 9, 2010, Petitioner sought leave from the New York Court of Appeals to appeal the Second Department's decision, reiterating the four claims made on direct appeal. The DA opposed the application, arguing that Petitioner's claims were neither meritorious nor worthy

of further review. On March 2, 2011, Judge Carmen B. Ciparick of the New York Court of Appeals denied Petitioner's application. *See People v. Hicks*, 16 N.Y.3d 831 (2011). Petitioner did not seek a writ of certiorari from the United States Supreme Court.

## PROCEDURAL BACKGROUND

Petitioner filed the instant Petition in the United States District Court for the Eastern District of New York on November 11, 2011. Dkt. 1. Petitioner, appearing *pro se*, raised the exact same grounds that his attorney argued before the Second Department. The case was originally assigned to the Hon. United States District Judge Joanna Seybert who ordered Respondent, being represented by the DA's Office, to show cause as to why the writ should not be issued. Dkt. 4. On December 20, 2011, Respondent requested an extension of time to file its response to the Petition, *see* Dkt. 6, which was subsequently granted by Judge Seybert, *see* Minute Entry of 12/21/2011.

The matter was reassigned to this Court on January 18, 2012. Minute Entry of 1/18/2012. A second request for an extension of time to respond was filed on January 26, 2012, *see* Dkt. 7, which the Court granted, *see* Minute Entry of 1/26/2012. Respondent's opposition brief was filed on February 27, 2012. Dkt. 8 ("Resp.'s Br."). Petitioner filed a traverse in response on March 14, 2012. Dkt. 10 ("Pet.'s Reply"). To date, Petitioner has not filed a memorandum of law in this action. However, the Court has taken judicial notice of the brief filed by his appellate counsel before the Second Department, which argues the same four grounds raised in this Petition, and considered the arguments articulated there to the fullest extent possible in this action.

On August 23, 2013, Petitioner filed a motion to have counsel appointed in this matter, *see* Dkt. 11, which the Court referred to the Hon. United States Magistrate Judge Roanne L. Mann, Minute Entry of 8/29/2013. On October 8, 2013, Judge Mann issued a Memorandum and Order denying Petitioner's motion without prejudice. Dkt. 12 ("Mag.'s Order"). Judge Mann

found that "the legal issues raised in this case are not particularly complex" and were adequately briefed in the papers already filed by Petitioner. Mag.'s Order at 2–3. Finding no "special reason" to appoint counsel, Judge Mann denied Petitioner's request. *Id.* at 3. Petitioner was instructed to file any objections to the ruling by October 25, 2013 or they would be deemed waived. *Id.* Petitioner has filed no objections.

## STANDARD OF REVIEW

A federal habeas court may only consider whether a person is in custody pursuant to a state court judgment in violation of the United States Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires federal courts to apply a "highly deferential standard" when conducting habeas corpus review of state court decisions. *Renico v. Lett,* 559 U.S. 766, 773 (2010). A petitioner is entitled to habeas corpus relief if he can show that the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1); *see Penry v. Johnson,* 532 U.S. 782, 792 (2001) ("A state court decision will be contrary to our clearly established precedent if the state court either applies a rule that contradicts the governing law set forth in our cases, or confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.") (internal citations and quotations omitted). The Supreme Court has explained that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams v. Taylor,* 529 U.S. 362, 410 (2000) (opinion of O'Connor, J.) (emphasis in original). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Instead, the state court's application of federal constitutional principles must be

"objectively unreasonable" to warrant issuance of the writ. *Id.* at 409; *see also Bobby v. Dixon*, 132 S.Ct. 26, 27 (2011) (*per curiam*) ("a state prisoner seeking a writ of habeas corpus from a federal court must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.") (internal citations and quotations omitted). "This distinction creates a substantially higher threshold for obtaining relief than *de novo* review." *Renico*, 559 at 773 (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). Additionally, "[e]valuating whether a rule['s] application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Harrington v. Richter*, 131 S. Ct. 770 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

As the federal habeas court, we review the Second Department's decision denying Petitioner's claims of constitutional error in light of these principles.

## ANALYSIS

Petitioner raises four challenges to his conviction. *First*, Petitioner contends that the trial court "erred in allowing the different burglaries to be tried together where the quantity of proof was widely disparate[,]" and that the Clyde Ave. Burglary should have been dismissed as a matter of law (hereinafter "Ground One"). *Second*, Petitioner argues that the DA did not meet its burden during the suppression hearing, and that the evidence recovered by the police after his arrest, any out-of-court statements made, and the show-up identification after the Forest Ave. Burglary should have been suppressed (hereinafter "Ground Two"). *Third*, Petitioner argues that he was denied his right to a fair trial and due process where, in the wake of the incident with PJ10, the trial court did not individually inquire what the members of the jury panel heard and refused to excuse the entire panel (hereinafter "Ground Three"). *Fourth*, Petitioner contends that

he was denied his rights to a fair trial and self-representation when the court granted his request to represent himself, but denied his request for an adjournment to review the *Rosario* material and prepare his defense (hereinafter "Ground Four"). For the reasons that follow, none of these claims provide this Court a basis on which to issue a writ of habeas corpus.

I.    GROUND ONE

Petitioner contends that by refusing to sever the indictment and conduct separate trials for each burglary, the trial court deprived him of his Fifth Amendment right to a fair trial. Petitioner believes that the disparity in proof amongst the burglaries led to convictions for crimes based on improper propensity evidence. According to Petitioner's brief in the Second Department, the DA used the strong evidence from the Flint Ave. Burglary to bolster the proof on the other burglaries, where the evidence "ranged from legally insufficient to questionably weak." (App. Br. at 20). Respondent argues that the four burglaries were easily segregable for the jury who, following the trial court's instructions, ultimately acquitted Petitioner on one of the burglary charges. The Court agrees with Respondent.

Under New York law, to consolidate criminal charges in one indictment, the offenses, "[while] based upon different criminal transactions," must be "defined by the same or similar statutory provisions and consequently are the same or similar in law[.]" N.Y. Crim. P. L. § 200.20(2)(c). Furthermore, the prosecutor must demonstrate to the satisfaction of the trial judge that combining the charges in a single indictment for a single trial is "an appropriate exercise of discretion." *People v. Lane*, 56 N.Y.2d 1, 7 (1982); *see also Shand v. Miller*, 412 F. Supp. 2d 267, 271 (W.D.N.Y. 2006) (Bianchini, M.J.). A court may, within its discretion, "in the interest of justice and for good cause shown" grant an application for severance. N.Y. Crim. P. L. § 200.20(3).

"Joinder of offenses rises to the level of a constitutional violation only if it *actually* render[s] petitioner's state trial fundamentally unfair and hence, violative of due process." *Herring v. Meachum,* 11 F.3d 374, 377 (2d Cir. 1993) (emphasis added); *see also United States v. Lane,* 474 U.S. 438, 446 n.8 (1986) (erroneous joinder violates the constitution "only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial."); *McKinnon v. Superintendent, Great Meadow Corr. Facility,* 422 F. App'x 69, 72 (2d Cir. 2011) ("Improper joinder of charges against a defendant does not, in itself, amount to a constitutional violation."). "Where the jury learns of multiple crimes alleged to have been committed by a defendant, '[t]he defendants' interests are protected by limiting instructions[.]'" *McKinnon,* 422 F. App'x at 72 (quoting *Spencer v. Texas,* 385 U.S. 554, 561 (1967)). "In considering whether a violation of due process has occurred, the emphasis must be on the word 'actually'; for, viewed clearly, it is only the consequences of joinder, over which the trial judge has much control, and not the joinder itself, which may render the trial 'fundamentally unfair.'" *Herring,* 11 F.3d at 377 (citing *United States ex rel. Evans v. Follette,* 364 F.2d 305, 306 (2d Cir. 1966), *cert. denied,* 385 U.S. 1016 (1967) (*per curiam*)).

While the Circuit has considered the danger of jurors considering the evidence cumulatively, *United States v. Lotsch,* 102 F.2d 35, 36 (2d Cir. 1939) (L. Hand, J.), and the potential for pre-judgment when the jury knows that a defendant is charged with multiple crimes instead of one, *see United States v. Werner,* 620 F.2d 922, 929 (2d Cir. 1980), the "joinder of offenses has long been recognized as a constitutionally acceptable accommodation of the defendant's right to a fair trial." *Herring,* 11 F.3d at 377. "Therefore, where a defendant is claiming a due process violation based upon joinder of offenses, he must, to succeed, go beyond the potential for prejudice and prove that *actual* prejudice resulted from the events as they unfolded during the joint trial." *Id.* at 377–78 (citing *Tribbitt v. Wainwright,* 540 F.2d 840, 841

(5th Cir. 1976) (joinder must "actually" render trial fundamentally unfair before habeas relief is appropriate); *Opper v. United States,* 348 U.S. 84, 94–95 (1954) (general allegations of jury confusion in multiple defendant trial insufficient to warrant reversal of conviction in the absence of evidence of actual prejudice)).

Two additional principles guide the Court's analysis. First, "unless there is an overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant[,]" it must be presumed that the jury followed the trial court's instructions. *Greer v. Miller,* 483 U.S. 756, 766 n.8 (1987) (internal citations and quotations omitted). Additionally, there will be less risk for prejudice during a multi-count trial where the evidence with respect to each crime in the indictment is distinct and easily compartmentalized. *See Herring*, 11 F.3d at 378 (citing *United States v. Chang An-Lo,* 851 F.2d 547, 556 (2d Cir. 1988)).

At Petitioner's trial, the four burglaries were tried together in a single indictment. The jury was instructed that they would be considering different counts, that they should consider each independently, and that they must reach a separate verdict with regard to each count. (T. 642).[5] In reviewing the record, it is clear that the four crimes were easily segregable. The burglaries occurred on four different days, at four different locations, with four different victims, and different witnesses testifying as to each burglary. It is difficult for the Court to conceive of a scenario in which crimes, properly joined under N.Y. Crim. P. L. §200.20(2)(c), could be more easily compartmentalized and considered separately by a jury. The record also establishes that the jury indeed followed the court's instruction and successfully considered each burglary individually.

---

[5] The full charge stated: "You're going to be considering a number of counts and you're going to consider them independently of the others and you're going to reach a verdict with regard to each of the counts." (T. 642).

Most critically, the jury acquitted Petitioner on the burglary charge for the Marvin Ave. Burglary. This result vitiates Petitioner's argument for actual prejudice. *See Herring*, 11 F.3d at 378 (finding that when jury convicted petitioner on two counts and acquitted on two counts during a joint trial, it evinces that the jury considered the counts separately). Petitioner cannot satisfy his showing of actual prejudice when the record indicates that the jury actually followed the court's instructions and considered the different counts against him separately.

Petitioner argued, for the first time, on appeal to the Second Department that he wanted to testify regarding the Flint Ave. Burglary but had no evidence to offer regarding the other burglaries. (App. Br. at 29–30). However, in order to be entitled to severance based on an asserted need to testify, a criminal defendant must make "a convincing showing that he ha[d] both [1] important testimony to give concerning one count and [2] strong need to refrain from testifying on the other." *United States v. Sampson*, 385 F.3d 183, 191 (2d Cir. 2004). Here, Petitioner satisfied neither prong. Petitioner made no showing that he had important testimony to proffer regarding the Flint Ave. Burglary. *See* App. Br. at 29 (Petitioner's appellate counsel conceded that "[w]e do not know what evidence [Petitioner] might have had to rebut the People's proof" with regard to the Flint Ave. Burglary). Furthermore, Petitioner made absolutely no showing that he had a "strong need to refrain from testifying" about the other three burglaries. Instead, he made the insufficient claim that he merely had no testimony to give regarding these burglaries. (*See* App. Br. at 29) (Petitioner "did not have testimony to give" on at least two of the other incidents).

The Second Circuit requires more than such bare assertions to find that a defendant's need to testify requires severance of an indictment. The Circuit has held that:

> it is essential that the defendant present enough information—regarding the nature of the testimony he wishes to give on one count and his reasons for not wishing to

> testify on the other—to satisfy the court that the claim of prejudice is genuine and
> to enable it intelligently to weigh the considerations of economy and expedition in
> judicial administration against the defendant's interest in having a free choice
> with respect to testifying.

*Sampson*, 385 F.3d at 191 (quoting *Baker v. United States*, 401 F.2d 958, 977 (D.C. Cir. 1968)) (internal quotations and citations omitted); *see also* N.Y. Crim. P. L. § 200.20(3)(b) (discussing the "convincing showing" required for severance based on the need to testify under New York law). Petitioner presented no such information to the trial court nor the Second Department, and neither court misapplied federal law in denying Petitioner's request to sever.

In the absence of actual prejudice to Petitioner, the trial court's denial of his motion to sever the indictment and the Second Department's affirmance of that decision were neither contrary to nor unreasonable applications of clearly established federal law. Accordingly, Ground One of the Petition is rejected.[6]

II.     GROUND TWO

Ground Two is a compound claim. *First*, Petitioner challenges the state court's ruling that his arrest was lawful and that evidence obtained as a result of that arrest was properly admissible. *Second*, Petitioner challenges the show-up identification procedure used by the police prior to effectuating his arrest as unduly suggestive. Respondent replies that the unlawful arrest claim is barred from collateral habeas review and that, given the close temporal and spatial

---

[6] Petitioner also requests that the charges related to the Clyde Ave. Burglary be dismissed as a matter of law because the conviction was based on the "scant proof" of a lighter with Petitioner's DNA being found outside the smashed window of the burglarized home. (*See* App. Br. at 25). Based on the argument in the Second Department brief, it is Petitioner's theory that because this was the only evidence the jury could have properly considered, its verdict must have relied on propensity evidence in order to convict him of the Clyde Ave. burglary. (*See id.* at 25–27). Ultimately, this is another rendition of Petitioner's attack on the denial of the motion to sever. In light of this Court's holding that no actual prejudice resulted from trying the counts jointly, there is no basis for finding that the state courts unreasonably applied federal law in upholding Petitioner's conviction on the Clyde Ave. Burglary.

proximity to the crime, the show-up identification was proper. For the reasons that follow, the Court agrees with Respondent.

### A. Fourth Amendment Challenge

As a general rule, state court Fourth Amendment rulings are barred from collateral review by a federal habeas court. *See Stone v. Powell*, 428 U.S. 465, 482 (1976). "[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence [unconstitutionally] obtained . . . was introduced at his trial." *Id.*; *see also Young v. Conway*, 698 F.3d 69, 85 (2d Cir. 2012). Two exceptions apply. Fourth Amendment claims will be considered on collateral habeas review if (1) "the state [] provided no corrective procedures at all to redress the alleged [F]ourth [A]mendment violations" or (2) "the state has provided a corrective mechanism, but defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." *Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992).

Here, Petitioner seeks to challenge the state court's decision to allow the fruits of his stop and subsequent arrest to be admitted at trial alleging a violation of his Fourth Amendment rights. However, neither exception to the rule in *Stone* applies and the Court cannot grant habeas relief on these Fourth Amendment grounds.

It has been clearly established by the courts of this Circuit that New York provides defendants with a facially adequate corrective procedure to raise Fourth Amendment challenges prior to trial. *See Capella*, 975 F.2d at 70, n.1; *Gates v. Henderson*, 568 F.2d 830, 837 (2d Cir. 1977) (en banc); *see also Bullock v. Grassiano*, 13-CV-5081, 2013 WL 5774870, at *5 (E.D.N.Y. Oct. 24, 2013) (Cogan, J.) (collecting cases). Furthermore, Petitioner has not introduced even a scintilla of evidence that there was an unconscionable breakdown whereby the state system "failed

to conduct a reasoned method of inquiry into relevant questions of fact and law." *Capellan*, 975 F.2d at 71 (internal quotations and citations omitted). In fact, Petitioner would be hard-pressed to do so as the trial court held an evidentiary hearing, allowed Petitioner to present a case in support of his motion, and issued a reasoned ruling that there was reasonable suspicion to stop Petitioner and that the resulting evidence would be admissible at trial. The Second Department heard Petitioner's complaint and received an extensive written brief on appeal, before affirming the trial court's determination. *See Hicks*, 78 A.D.3d at 1075–76. In short, there was no breakdown in New York's corrective mechanism for Fourth Amendment challenges.

As Respondent argues, Petitioner's issue appears to be with the result of his suppression motion, not the process that New York afforded him. A writ of habeas corpus will not issue on a Fourth Amendment challenge if the process and procedures were facially adequate and did not breakdown during Petitioner's individual case. *See Christopher v. Connolly*, 06-CV-1575, 2013 WL 1290810 (E.D.N.Y. Mar. 28, 2013) (Mauskopf, J.).

### B. Show-Up Identification Challenge

"[T]he admission of evidence of a showup without more does not violate due process." *Neil v. Biggers*, 409 U.S. 188, 198 (1972). To determine whether an identification violates a criminal defendant's due process rights, a court must first determine whether the "law enforcement officers use[d] an identification procedure that [was] both suggestive and unnecessary." *Perry v. New Hampshire*, 132 S. Ct. 716, 724 (2012) (citing *Manson v. Brathwaite*, 432 U.S. 98, 107 (1977); *Biggers*, 409 U.S. at 198). However, "[e]ven when the police use such a procedure . . . suppression of the resulting identification is not the inevitable consequence." *Id.* The court must apply a "totality of the circumstances" approach, on a case-by-case basis, to determine "whether [the] improper police conduct created a 'substantial likelihood of misidentification.'" *Id.* at 724–25. (quoting *Biggers*, 409 U.S. at 201).

Show-up identifications are not *per se* unduly suggestive. *See Warren v. Conway*, 07-CV-4117, 2008 WL 4960454, at *23 (E.D.N.Y. Nov. 18, 2008) (Feuerstein, J.) (citing *Stovall*, 388 U.S. at 302). "[W]hether [an] identification procedure was unnecessarily suggestive depends on (1) [the] suggestiveness of the procedure and (2) [the] necessity of [the] procedure." *United States v. Stevens*, 935 F.2d 1380, 1389 (3d Cir. 1991); *see also United States v. Bautista*, 23 F.3d 726, 730 (2d Cir. 1994). Where a law enforcement officer "has or should have doubts whether a detained suspect is in fact the person sought, the officer must make immediate reasonable efforts to confirm the suspect's identity." *Bautista*, 23 F.3d at 730 (quoting *United States v. Valez*, 796 F.2d 24, 27 (2d Cir. 1986)) (internal quotations omitted)). In fact, "prompt confrontation [is] desirable because it serve[s] to insure 'the immediate release of an innocent suspect and at the same time [to] enable the police to resume the search for the fleeing culprit while the trail is still fresh.'" *United States ex rel. Cummings v. Zelker*, 455 F.2d 714, 716 (2d Cir. 1972), *cert. denied*, 406 U.S. 927 (1972) (internal quotations and citations omitted); *see also James v. Senkowski*, 97-CV-3327, 1998 WL 217903, at *7 (S.D.N.Y. Apr. 29, 1998) (Cote, J.). Accordingly, "it is now settled law that prompt on-the-scene confrontation is consistent with good police work and does not offend [constitutional] principles[.]" *Zelker*, 455 F.2d at 716 (internal citations and quotations omitted).

"Showup identification procedures that occurred within temporal and geographic proximity to the crime have generally not been found to be unduly suggestive." *Warren*, 2008 WL 4960454, at *23 (holding that a show-up identification that occurred less than ninety minutes after the commission of the crime and within one mile of the crime scene was not unnecessarily suggestive because of its close temporal and geographic proximity to the crime); *see also Bautista*, 23 F.3d at 730 (affirming admission of on-scene show-up identification finding that "[t]he fact that the suspects were handcuffed, in the custody of law enforcement

officers, and illuminated by flashlights also did not render the pre-trial identification procedure unnecessarily suggestive"); *Charlemagne v. Goord*, 05-CV-9890, 2008 WL 2971768, at * 15 (S.D.N.Y. June 30, 2008) (Pitman, M.J.), *report and recommendation adopted*, 2011 WL 2150646 (S.D.N.Y. May 31, 2011) (Batts, J.) (finding that a show-up procedure that occurred within thirty minutes and eighteen blocks from the scene of the crime was not unduly suggestive and citing cases).

Here, Petitioner was stopped four to five blocks from the scene of the crime. He was heading in the direction that the eyewitness 911 caller reported that the perpetrator had fled. Petitioner also matched the description given by the witness, Deluca. Deluca agreed to go to the scene of the stop with a responding officer and when Deluca arrived, Petitioner was neither handcuffed nor under arrest. Only Officer D'Alto stood next to Petitioner and, while there were four other officers on the scene, they were not surrounding him.[7] Deluca immediately identified Petitioner as the individual he saw break into the Forest Ave. home and subsequently flea. The identification was made five to ten minutes after the 911 call and four or five blocks from the home.

The officers here had an unassailable interest in determining whether Petitioner was the individual Deluca had seen breaking into the Forest Ave. home or whether they needed to continue pursuing a fleeing suspect. *See Zelker,* 455 F.2d at 716. The temporal and geographic proximity to the events here—five to ten minutes after the commission of the crime and four to five blocks from the scene of the crime—is far closer than in other instances where courts have found show-up

---

[7] Officer D'Alto's unchallenged testimony from the suppression hearing makes clear that Petitioner was not surrounded by officers, as Petitioner contended before the Second Department (*see* App. Br. at 40), but that only one officer was next to Petitioner, (*see* Dkt. 8-1 (Ex. 2, Respondent's Brief in *People v. Hicks*, 2009-6011 (2d Dep't 2010) ("Resp.'s App. Br.")), at 37–38 (citing (Hearing Transcript ("H.") at 19-20))). Also, any contention that stolen jewelry was on the hood of the police vehicle does not comport with the consistent testimony of the officers that Petitioner was not searched until *after* he was arrested and, therefore, *after* the identification. (*Compare* App. Br. at 40 *with* Resp.'s App. Br. at 36 (citing H. 9, 14–15, 21)).

identifications not "unnecessarily suggestive." *Cf., e.g., Warren*, 2008 WL 4960454, at *23 (ninety minutes and one mile); *Charlemagne*, 2008 WL 2971768, at *15 (thirty minutes and eighteen blocks). Given the close temporal and spatial proximity between the identification and the crime, the hearing court's admission of the show-up identification was wholly appropriate. This decision and the Second Department's subsequent affirmance were neither contrary to nor unreasonable applications of clearly established federal law.

Accordingly, neither of Petitioner's claims in Ground Two warrant the issuance of a writ of habeas corpus.

### III. GROUND THREE

As his third basis for habeas relief, Petitioner contends that following the incident with PJ10, the trial court should have inquired what, if anything, the members of the jury panel had heard and excused the entire panel of potential jurors. And while Petitioner's trial counsel did not request such an inquiry, Petitioner nonetheless now avers that he was deprived of his right to a fair trial.

As discussed above, *see supra* FACTUAL BACKGROUND III.A, following an animated conversation with a CSO in the hallway, PJ10 was questioned by the court and defense counsel outside the presence of the jury panel. PJ10 explained that she thought that Petitioner was looking at her, that he was considering stealing her property, and that she knew that Petitioner was guilty. PJ10 testified that no other member of the jury panel heard her statements to the CSO. She was subsequently excused from the jury panel. Defense counsel then expressed his satisfaction with the process, explicitly declined for the court to hold an "inquest," and stated that jury selection could continue. Defense counsel did not request to question any other members of the jury panel at that time. The entire jury panel was then brought back to the courtroom and instructed "not [to] speculate on who or what may have been involved [during the matter addressed during the lunch recess], but [to be] assure[d] that . . . it was dealt with promptly." (T. 302).

—23—

The Sixth Amendment of the federal Constitution ensures that a criminal defendant is given a trial by a jury of his peers and is afforded the opportunity to confront his accusers. *See Loliscio v. Goord,* 263 F.3d 178, 184–85 (2d Cir. 2001) (citing U.S. Const., amend. VI). "[T]rial by jury in a criminal case necessarily implies at the very least that the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Id.* (quoting *Turner v. Louisiana,* 379 U.S. 466, 472–73 (1965)). "When extra-record material infiltrates the jury's deliberations, a criminal defendant's Sixth Amendment rights thus are implicated because the information was not subjected to the rigors of cross-examination at trial." *Bowers v. Walsh,* 277 F. Supp. 2d 208, 218 (W.D.N.Y. 2003) (Larimer, J.). However, a "trial court has wide discretion in determining how to pursue an inquiry into the effects of extra-record information upon a jury." *Chang An-Lo,* 851 F.2d at 558. "A court need not inquire into juror-misconduct allegations unless the defendant provides 'reasonable grounds' for an inquiry; the defendant may not request a hearing to conduct a 'fishing expedition.'" *Taus v. Senkowski,* 134 Fed. App'x 468, 470 (2d Cir. 2005) (quoting U*nited States v. Moten,* 582 F.2d 654, 667 (2d Cir. 1978)).

Furthermore, on collateral habeas review, "the state trial court is entitled to a presumption of correctness with respect to its conclusion that the jury was impartial." *Fama v. Comm'r of Corr. Servs.,* 235 F.3d 804, 813 (2d Cir. 2000). "[T]he Supreme Court has made it clear that the 'trial court's findings of impartiality [may] be overturned only for manifest error.'" *Id.* (quoting *Knapp v. Leonardo,* 46 F.3d 170, 176 (2d Cir. 1995) (alteration in original)). The federal court's role on a collateral challenge to a state verdict is to determine whether there is "fair support in the record for the state court['s] conclusion that the jurors [were] impartial." *Patton v. Yount,* 467 U.S. 1025, 1038 (1984). If the "record is devoid of any evidence that an empaneled juror knew" of the alleged extra-record statements, it supports the

trial court's conclusion that the jury was impartial. *Brown v. Smith*, 171 Fed. App'x 889, 891 (2d Cir. 2006). And while "extra-record information of which a juror becomes aware is presumed prejudicial, [the court] will not presume that the jury actually became aware of the extra-record information." *Id.* (internal quotations and citations omitted). Crucially, the Second Circuit has held that a bare allegation that a comment heard by a court officer was also heard by members of the jury panel "does not rise above the level of mere speculation" and would be "contrary … to the presumption of correctness that that [a federal habeas court] must afford the [state court] verdict." *Id.* (citing *Fama*, 235 F.3d at 813).

The standards for reviewing a trial court's determination of jury impartiality are broad, and the federal habeas court must only determine whether the holdings of the state court were "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement." *See Harrington*, 131 S.Ct. at 786–87. In other words, there must be "manifest error" to overturn the state trial court's finding of juror impartiality. *Patton*, 467 U.S. at 1031.

The record here is clear that the trial judge's conduct was well within the wide discretion he had to ensure that Petitioner's jury was impartial. The trial court afforded ample opportunities at the appropriate times for Petitioner's counsel to ensure that PJ10's statements were only heard by the CSO. Furthermore, PJ10 was excused, there was no indication from any source at any time that any potential juror heard PJ10's comments, and defense counsel gave his approval of the trial judge's actions at each stage of the process. As in *Brown*, the record is simply devoid of evidence that any potential juror heard PJ10's comments. *See Brown*, 171 F. App'x at 891. Petitioner's request, after dismissing his attorney, to re-open questioning of the jury panel, in the

absence of any indication that they had been tainted by PJ10's comments,[8] was an impermissible attempt to conduct a "fishing expedition." *Taus*, 134 F. App'x at 470.

Additionally, the state court's instruction effectively cured any potential prejudice. *See Zafiro v. United States*, 506 U.S. 534, 540–41 (1993) (stating that it is presumed that the jury adhered to its instructions).

In short, there is no indication that the trial court's decision was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, particularly in light of the broad principals guiding determinations of jury impartiality. Accordingly, Ground Three of the Petition is rejected.

IV.    GROUND FOUR

Petitioner's final claim is that he was deprived of his rights to a fair trial and self-representation when the trial court would not permit a one to four week adjournment after jury selection and just before the start of opening arguments. Petitioner's position is that the trial court abused its discretion in denying the request when the fundamental right to self-representation was implicated. (App. Br. at 54–55).

"It is, of course, well established as a fundamental matter of due process that the defendant in a criminal case has the right to present a defense, that is, to present to the jury admissible evidence that might influence the determination of guilt." *Grotto v. Herbert*, 316 F.3d 198, 205-06 (2d Cir. 2003). However, "[n]ot every restriction on counsel's time or

---

[8] Petitioner's request to canvass the jurors once he began his self-representation was based on the unadorned and conclusory allegation that he did not believe PJ10. (T. 376). This differs materially from circumstances in which trial courts canvass potential jurors to determine whether they have been exposed to pre-trial publicity as, in those instances, there is always a grounded basis for believing that potential jurors may have encountered press materials prior to beginning their jury service. *Cf. United States v. McDonough*, 56 F.3d 381, 386 (2d Cir. 1995); *United States v. Gaggi*, 811 F.2d 47, 51 (2d Cir. 1995).

opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel." *Morris v. Slappy*, 461 U.S. 1, 11 (1983). A ruling on a request for an adjournment is "traditionally within the discretion of the trial judge" and the trial judge is given great latitude in scheduling his or her own trials. *Unger v. Sarafite*, 376 U.S. 575, 589 (1964). The burdens of ensuring that all of the moving parts of a trial come together at the same place and at the same time "counsel[] against continuances except for compelling reasons." *Morris*, 461 U.S. at 11. "Consequently, broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay'" violates due process. *Id.* (quoting *Ungar*, 376 U.S. at 589). "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Ungar*, 376 U.S. at 589; *see also Grotto*, 316 F.3d at 206.

Here, there was neither an arbitrary denial by the trial judge nor an unreasonable insistence on expeditiousness. Therefore, Petitioner's rights to a fair trial and self-representation were not violated. *See, e.g.*, *Ungar*, 376 U.S. at 591 (no due process violation when self-represented defendant was denied an adjournment to gather exonerative medical evidence); *Jones v. Conway*, 442 F. Supp. 2d 113, 129 (S.D.N.Y. 2006) (Chin, D.J.) (finding no ineffective assistance of counsel when attorney failed to prepare defendant to testify and the trial court denied a three-hour adjournment). The trial judge told Petitioner, prior to granting his request to self-represent, that there would be no adjournment and opening statements would commence that day. Nonetheless, Petitioner requested an adjournment once he began representing himself. The court ruled that Petitioner had been given all required *Rosario* materials in a timely fashion, that he had the assistance of stand-by counsel, and that a week-long adjournment would be

disruptive. Additionally, the trial court found, and the Second Department agreed, that Petitioner's request was a dilatory tactic. *See Hicks*, 78 A.D.3d at 1076. Petitioner never requested an adjournment for any period of time of time less than one week. (T. 378–82). The trial court's exercise of discretion, under the circumstances present at that stage in the trial and under this record, was appropriate. *See Jackson v. Poole*, 06-CV-188, 2011 WL 4901314, at *13 (S.D.N.Y. July 19, 2011) (Freeman, M.J.) (trial court's denial of a two-hour adjournment to allow counsel to prepare defendant to testify was appropriate act of discretion; adjournment was requested on the final day of trial and counsel would have the lunch break to prepare defendant), *report & recommendation adopted*, 2011 WL 4908740 (S.D.N.Y. Oct. 14, 2011) (Castel, J.).

The circumstances surrounding Petitioner's request indicate that he was not prejudiced by the court's refusal to permit an adjournment. Petitioner had previously informed the court that he had discussed the case with his attorney; the *Rosario* material was exchanged in a timely fashion; and Petitioner had the same opportunity that any defense counsel would have had to review that material. Notably, Petitioner had the opportunity throughout the trial to consult with his well-prepared attorney (who was in a position to try the case prior to Petitioner dismissing him on the eve of trial). And while four witnesses testified on the first day of trial, Petitioner had the entire weekend as well as the following Monday and Tuesday evenings to prepare additional defenses. Furthermore, as Respondent notes, "[t]he vociferous defendant never contended that [during trial] he [was] precluded from presenting a particular line of questioning or defense strategy as a result of the lack of an adjournment." Dkt. 8-1 (Resp.'s Aff. and Mem. of Law in Opp. to Pet. ("Opp. Br.")), at 61.

In light of the broad discretion that a state trial judge has in ruling on adjournment requests, it is evident that the trial court's decision and the Second Department's affirmance were neither

contrary to nor unreasonable applications of clearly established Supreme Court precedent. Accordingly, Petitioner's claim in Ground Four is denied.

## CONCLUSION

Hick's Petition for a writ of habeas corpus is DENIED in its entirety. A certificate of appealability shall not issue. *See* 28 U.S.C. § 2253. The Clerk of the Court is respectfully directed to serve notice of entry of this Order on all parties and to close the case.

**SO ORDERED.**

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: September 9, 2014
     Brooklyn, New York